UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FROOM-LIPMAN GROUP, L.L.C., *et al.*, | ) | Case No.: 1:06 CV 185 |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| FOREST CITY ENTERPRISES, INC., | ) | |
| | ) | FINDINGS OF FACT AND |
| Defendant | ) | CONCLUSIONS OF LAW |

The above-captioned case is between Plaintiffs Froom-Lipman Group, L.L.C., Ronald

J. Froom, and Mark R. Lipman, ("Froom-Lipman" or "Plaintiffs") and Defendant Forest City

Enterprises, Inc. ("Forest City" or "Defendant").  The parties began a bench trial on February

17, 2010.  (Minutes of Proceedings, ECF No. 85.)  Shortly after the conclusion of the trial,

both parties submitted Amended Proposed Findings of Fact and Conclusions of Law.  (ECF

Nos. 88, 90-1.)  The following is the court's findings of fact and conclusions of law.  For the

following reasons, the court finds that Plaintiffs Froom and Lipman are entitled to an award

of damages in the amount of $750,000.

## I.  FINDINGS OF FACT

1.     On January 25, 2006, Plaintiffs filed the instant lawsuit against Forest City, alleging

        that Forest City had breached an oral agreement for a joint venture agreement whereby

in return for introducing Magna Entertainment Corp. ("Magna") to Forest City, Forest City had allegedly agreed to grant to Plaintiffs a 15% equity interest in any Magna properties for which Forest City obtained a development contract. Plaintiffs alleged that Forest City agreed to make Plaintiffs its partners. Plaintiffs alleged five counts of various breach of contract and contract-related claims as well as a claim for unjust enrichment.  (Order, ECF No. 53.) Forest City denied the existence of any oral agreement and asserted Plaintiffs were brokers.

2.     On July 9, 2009, this court entered summary judgment in favor of Forest City on all of Plaintiffs' contract and contract-related claims (Counts One, Two, Three, Five and Six) on the grounds that the alleged oral agreement was unenforceable under Florida's Statute of Frauds. (Order, ECF No. 53.)

3.     Forest City did not move for summary judgment on Count Four, Plaintiffs' unjust enrichment claim, because Forest City has never disputed that Plaintiffs should be fairly compensated for their services as a broker. (Order, ECF No. 53.) The sole remaining issue in dispute is the amount that Plaintiffs should be fairly compensated under the equitable theory of unjust enrichment.

4.     A Bench Trial commenced on Count Four, Plaintiff's remaining claim for unjust enrichment, on February 17, 2010.  Trial concluded on February 18, 2010.

5.     Plaintiff Froom-Lipman Group, L.L.C. ("Froom-Lipman") is a Florida limited liability company engaged in the business of real estate development, with its principal place of business in Aventura, Florida. (Stipulations, ECF No. 82, ¶ 5.) The two principals

of Froom-Lipman, Ronald J. Froom ("Froom") and Mark R. Lipman ("Lipman"), also Plaintiffs in this action, reside in and are domiciled in Florida as well. (*Id.*)

6.   Froom is and has been a licensed real estate broker based in Florida for approximately thirty years. (Stipulations, ECF No. 82, ¶ 6.) Froom also is the sole owner of Diversified Investment Properties ("Diversified"), a real estate brokerage company incorporated and based in Florida. (*Id.*) Lipman is a licensed real estate agent in Florida. (*Id.*) Lipman was affiliated with Diversified as a "broker salesman" at all times relevant to this action.  (*Id.*)

7.   In or about 1998, Froom and Lipman identified undeveloped land surrounding the Gulfstream Park horse racing track in Hallandale, Florida ("Gulfstream"), which had been owned by a Japanese company and was acquired by Magna in 1999.  (*Id.* ¶ 7.) Plaintiffs believed the tract of land was suitable for development, and they set out to locate a large developer who would be in a position to develop the land. In February 1999, they first contacted Forest City to see if Forest City would be interested in exploring the possible development of the land at Gulfstream.  (*Id.*)

8.   In response to Plaintiffs, Forest City, which is a NYSE-listed national real estate development company headquartered in Cleveland, Ohio, requested that Froom line up an initial exploratory meeting with Magna to discuss the possible development of Gulfstream.  (Stipulations, ECF No. 82 at ¶ 9.) Froom set up a meeting between Forest City and Magna in April 2000. (*Id.*)  At trial, Forest City put into evidence a time line which sets forth the relevant events discussed below. (Def. Ex. GG.)

9.  Between April 2000 and May 2002, Froom and Lipman set up four meetings between Forest City and Magna to discuss developing Gulfstream.

10. <u>Meeting #1</u>: In April 2000, executives from Magna and Forest City, along with Froom and Lipman met together in Cleveland for the first time to discuss developing Gulfstream. (Stipulations, ECF No. 82 at ¶ 10.)

11. Subsequent to this first meeting between Magna and Forest City, from April 2000 and September 2000, Froom periodically continued to broker a relationship between Forest City and Magna. (Stipulations, ECF No. 82 at ¶¶ 10, 11.) These efforts were carried out exclusively by Froom and consisted of four emails or letters sent to Magna (Def. Ex. FF), and perhaps some undocumented telephone calls. With respect to phone calls, Froom's phone records do not evidence any calls to Magna during the relevant time periods. (Def. Ex. EE, Plaintiffs' Response to Interrogatories, App. H; Defendant Forest City Enterprises, Inc.'s Designations Of Deposition Testimony To Be Used as Evidence at Trial for Ronald Froom at 77-78, 83-84, 266-67, ECF No. 71, hereinafter, "Froom Dep. Tr. at ___, ECF No. 71" or "Lipman Dep. Tr. at ___, ECF No. 71".) At Froom's deposition which Forest City submitted at trial as part of its evidentiary submissions, Froom testified that he kept no track or any record of any calls he made, and he made no notes. (*Id.*)

12. <u>Meeting #2</u>: In September 2000, pursuant to Froom's arrangements, Forest City and Magna executives met for the second time to discuss the possibility of moving forward with developing Gulfstream. (Stipulations, ECF No. 82 at ¶ 11.) No agreement between Forest City and Magna was reached at that meeting. (*Id.*)

-4-

13. Subsequent to this second meeting between Magna and Forest City, from September 2000 through March 2001, Froom periodically continued to broker a relationship between Forest City and Magna. (Stipulations, ECF No. 82 at ¶¶ 11-12.) Again, these efforts were carried out almost exclusively by Froom and consisted of a total of four emails or letters sent to Magna, (Def. Ex. FF), and perhaps some undocumented telephone calls. (Def. Ex. EE, Plaintiffs' Response to Interrogatories, App. H).

14. Meeting #3: In March 2001, as a result of Froom's efforts to broker an arrangement, Forest City and Magna executives met for the third time to discuss the possibility of moving forward with developing Gulfstream. (Stipulations, ECF No. 82 at ¶ 12.) No agreement between Forest City and Magna was reached at that meeting. (*Id*.)

15. Subsequent to the third meeting, from March 2001 through May 2002, Froom periodically continued his efforts to broker a relationship between Forest City and Magna. (Testimony of Brian Ratner.) These efforts consisted of one email to Magna, (Def. Ex. FF), and perhaps some undocumented telephone calls. (Def. Ex. EE, Plaintiffs' Response to Interrogatories, App. H).

16. Meeting #4: In May 2002, Froom arranged for a fourth meeting between Forest City and Magna, and for the first time the meeting included both the Chairman of Forest City (Albert Ratner) and the Chairman of Magna (Frank Stronach). (Stipulations, ECF No. 82 at ¶ 13.)

17. Subsequent to the May 2002 meeting, between October 2002 and March 2003, Froom sent a total of three emails or letters to Magna. (Def. Ex. FF.)

18.   Following the May 2002 meeting between Forest City and Magna, Froom and Lipman attempted to memorialize an alleged oral agreement in a document titled, "Joint Venture Understanding." (Stipulations, ECF No. 82 at ¶ 14.)

19.   Within days after Forest City received the document, Forest City senior executives met with Froom and Lipman at the Las Vegas shopping center convention on May 21, 2002, denied the existence of any oral agreement and instructed Plaintiffs not to attend an upcoming meeting that had been scheduled with the Mayor of Hallandale, Florida, and Forest City and Magna to discuss developing Gulfstream. (Order, ECF No. 53 at 7; Testimony of Brian Ratner, Trial Tr., at pp. 234-35; Stipulations, ECF No. 82 at ¶ 15.)

20.   Forest City's Senior Vice President Emerick Corsi followed that instruction with a letter dated May 29, 2002, whereby Froom and Lipman were put on formal notice that Forest City did not agree that it had entered into any oral agreement with Froom and Lipman in 2000 or at any other time:

> Over a year ago we had a meeting, and I explained to you at that time that there was no room to have a partnership agreement with your company.
> I also advised you that I would only acknowledge you as a broker in the deal, and that is exactly what I am doing.
> …
> I also would like to emphasize there at there is no joint venture between our companies. You are a broker.

(05/29/02 Letter from E. Corsi to R. Froom and M. Lipman, Def. Ex. J;  Testimony of Brian Ratner; Stipulations, ECF No. 82 at ¶ 16.)

21.    Thus, while Forest City denied the existence of an oral agreement for a 15% equity interest, it did not dispute that Plaintiffs acted as a broker or finder in finding the Gulfstream land and introducing Forest City to Magna.

**Plaintiffs' Involvement in Gulfstream Comes to an End**

22.    Once Forest City disputed the existence of any oral agreement, Plaintiffs' activities tapered off after May 2002.  (Testimony of Brian Ratner, Trial Tr., at p. 233.)   By early 2003, Plaintiffs were no longer sending emails or letters to Magna. Between October 2002 and March 2003, Froom sent only three letters or emails to Magna, and all contact ceased after March 2003. (Def. Ex. FF.)

23.    In June 2003, Forest City again told Plaintiffs that it had always viewed Plaintiffs as a broker, that in the event a deal occurred with Magna at that point Forest City intended to pay Plaintiffs a reasonable commission, but that Forest City did not believe anything further would be gained by continuing to work together with Plaintiffs. (Brian Ratner Trial Tr., at pp. 235-36; Def. Ex. L.)

24.    In total, Plaintiffs sent 15 emails or letters to Magna from October 1999 through March 2003. (Def. Ex. FF; Froom Dep. Tr. at 86-90, ECF No. 71.) Plaintiff put 13 of these emails or letters into evidence. (*See, e.g.*, Pl. Exs. 95, 96, 98, 134, 102, 103, 104, 106, 107, 108, 135, 138, 170.)

25.    In addition to sending the 15 emails or letters to Magna, and setting up the four meetings between Forest City and Magna, Plaintiffs, Froom and Lipman devised the concept of developing the land around Gulfstream Park into a mixed-used commercial development and offered comments and suggestions on how to develop The Village

at Gulfstream Park.  (Testimony of Brian Ratner, Trial Tr., at pp. 63-64.)   Prior to

March 2003, Froom and Lipman would share their thoughts with Forest City regarding

what they believed the project should look like.  (*Id.*, at pp. 64, 232-233.)

### Plaintiffs' Expectations As To Their Role

26.  After Plaintiffs had arranged the first meeting between Forest City and Magna in April

2000 discussed above, on April 14, 2000, Froom sent Forest City a letter wherein he

advised it that Froom and Lipman would seek to negotiate an agreement with Forest

City for an equity interest in the Gulfstream project in return for providing certain

services. (Def. Ex. D.) In the letter, Froom did not set forth any particular percentage

of equity interest Plaintiffs were seeking. (Def. Ex. D.)

27.  When Brian Ratner reviewed the April 14, 2000 letter, Ratner wrote in the margins

next to the paragraphs where Froom had set out what Plaintiffs proposed their role

would be in return for negotiating an equity interest, "we don't need this," and "their

role here is to introduce the parties, anything else?" (Def. Ex. D; Testimony of Brian

Ratner, Trial Tr., at p. 230.)   Ratner's thinking at that time, as evidenced by his

handwritten notes, was that Plaintiffs would take on a role as brokers or facilitators in

introducing the parties and fostering a relationship between Forest City and Magna.

(Def. Ex. D; Testimony of Brian Ratner, Trial Tr., at p. 230.)

28.  Consistent with Ratner's notes that he made in April 2000, Ratner testified that when

he met with Froom and Lipman in May 2000 in Las Vegas to discuss the potential

Gulfstream project, he did not enter into an oral agreement to provide Plaintiffs with

a 15% equity interest in the Gulfstream project. (Testimony of Brian Ratner, Trial Tr.,

-8-

at pp. 231-232.)  While he recalls Plaintiffs discussed wanting to negotiate an equity interest, he had no recollection that Plaintiffs had allegedly asked for 15% at this meeting. (*Id.*, at p. 233.)

29.   Ratner testified that at the May 2000 meeting, he told Plaintiffs that as there had only been one introductory meeting with Magna, it was too early on in the process for Forest City to know whether Gulfstream would be developed. (*Id.*, at pp. 58, 60.) Absent knowing what the size and scope of the project or deal with Magna would be, Ratner told Plaintiffs he could not discuss or agree to the parameters of Plaintiffs' compensation or fee arrangement. (*Id.*, at p. 60.)

30.   Ratner testified that he told Plaintiffs that once the Gulfstream parameters were defined, Forest City would be fair to Plaintiffs in paying them for their efforts in contacting Forest City about the development opportunity and for fostering a relationship between Forest City and Magna. (*Id.*)

31.   Thus, while Forest City knew that Plaintiffs had an expectation of compensation and Forest City agreed that if there was ever a development for Gulfstream, Plaintiffs would be entitled to compensation for their efforts, Forest City did not have an understanding that Plaintiffs had an expectation of a 15% equity interest in the project during the time Plaintiffs were working on setting up the meetings between Forest City and Magna.  (Testimony of Brian Ratner, Trial Tr., at p. 233.)

32.   The first time Forest City learned of Plaintiffs' expectation for a 15% equity interest was on May 2002, when Plaintiffs sent their letter purporting to memorialize what they believed had been an oral agreement reached with Forest City.  (*Id.*)

-9-

33.   At trial, Plaintiffs did not testify regarding this matter or any other matter.

**Plaintiffs Acted as Brokers for and as Advisors to Forest City**

34.   The evidence showed that when Lipman first introduced himself to Mr. Brian Ratner in 1999 at a shopping center convention in Las Vegas, he handed him his business card which identified Lipman as a "Broker/Associate" for Diversified Investment Properties. (Testimony of Brian Ratner, Trial Tr., at pp. 228-29; Def. Ex. A.)

35.   Prior to May 2002, when the dispute arose between the parties as to the nature of Plaintiffs' role and relationship with Forest City, Plaintiffs wrote all their correspondence to either Magna or Forest City on "Diversified Investment Properties, Inc." letterhead. (Def.'s Suppl. Designations of Froom Depo. Testimony to be Used as Evidence at Trial, ECF No. 86,  at pp. 203-04; *see also*, *e.g.*, Pl. Exs. 95, 102, 103, 104, 106, 107, 108; Def. Exs. C, D, FF.)

36.   On May 31, 2002, Plaintiffs first legally formed the entity called "Froom-Lipman Group, L.L.C." (Def. Ex. K.) As it did not exist until May 31, 2002, the legal entity "Froom-Lipman Group, L.L.C." did not perform any of the services or activities of fostering a relationship between Forest City and Magna and setting up the four meetings described above.  Nor could it have been a joint venture or equity partner with Forest City.

37.   In commercial real estate development, a broker finds or locates a business opportunity, brings that opportunity to a party who has the financial means to develop that business opportunity, a deal closes so that the party can develop the business opportunity, and a broker gets paid a reasonable commission or fee for his efforts.

(Testimony of Johannsen, Trial Tr., at p. 453.)  Defendant's expert, Mr. Johannsen, testified that Plaintiffs' efforts in locating the site, sending correspondence and arranging for the meetings between Magna and Forest City are precisely those types of activities which are performed by real estate brokers, as defined under Florida Chapter 475 FS and also by custom and practice.  (Testimony of Johannsen, Trial Tr., at p. 409.)

38.     Therefore, the court finds that Plaintiffs were not a part of a joint venture.  A joint venture under Florida law may be created by either express or implied contract, but "the contractual relationship must consist of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses, and (4) joint control or right of control."  *Williams v. Obstfeld*, 314 F.3d 1270, 1275-76 (11th Cir. 2002).  The relationship between Plaintiffs and Defendant does not have any of these elements except possibly a common purpose.

39.     Rather, the nature of the parties' relationship is that of a broker.  However, the relationship was not a simple brokerage relationship.  Plaintiffs provided advice for an extended period of time, from October 1999 through March 2003.

### Forest City and Magna's Agreements

40.     It was not until October 2003, that Forest City and Magna executed a Letter of Intent to develop Gulfstream for use as a mixed use center, featuring retail and commercial space as well as residential space. (Order, ECF No. 53 at 3; Testimony of Brian Ratner, Trial Tr., at p. 169; Def. Ex. M; Stipulations, ECF No. 82 at ¶ 17.)

-11-

41.     In April 2004, an entity of Magna ("Gulfstream Park Racing Association, Inc.") and an entity of Forest City ("Forest City Commercial Group, Inc.) entered into a Pre-Development Management Agreement to allow Forest City to begin the pre-development work for the first phase of the project. (Testimony of Brian Ratner, Trial Tr., at pp. 90-91; Def. Ex. P; Stipulations, ECF No. 82 at ¶ 18.)

42.     It then took until 2005 before Forest City and Magna were able to formally form their joint venture. In May 2005, a limited liability company known as "The Village at Gulfstream Park, LLC" was formed by two entities owned by Forest City and Magna, respectively.  (Testimony of Brian Ratner, Trial Tr., at pp. 93-94; Def. Ex. Q; Stipulations, ECF No. 82 at ¶ 19.)  The Forest City entity ("FC Gulfstream Park, Inc.") and the Magna entity ("GPRA Commercial Enterprises, Inc.") are 50% joint venture owners of the limited liability company ("The Village at Gulfstream Park, LLC"). (Testimony of Brian Ratner, Trial Tr., at pp. 93-94; Def. Ex. Q; Stipulations, ECF No. 82 at ¶ 19.)

43.     The limited liability agreement was subsequently amended in September 2005, to address Magna's decision to take back some of the acreage originally designated for the Gulfstream project in order to accommodate Magna's need for additional acreage for its gaming and horse stable operations. (Testimony of Brian Ratner, Trial Tr., at pp. 174-75; Def. Ex. R; Stipulations, ECF No. 82 at ¶ 20.)  In return for Magna taking back some of its acreage, the joint venture was given additional option rights for the Gulfstream development project. (Testimony of Brian Ratner, Trial Tr., at pp. 174-75; Def. Ex. R; Stipulations, ECF No. 82 at ¶ 20.)

44.     Almost four years after the October 2003 Letter of Intent – again long after any

        involvement by Plaintiffs – Forest City and Magna finally entered into a Development

        Agreement to develop Gulfstream. (Order, ECF No. 53 at 3; Def. Ex. U; Stipulations,

        ECF No. 82 at ¶ 21.) The Development Agreement and ancillary agreements were

        executed on August 3, 2007. (Order, ECF No. 53 at 3; Def. Ex. U; Stipulations, ECF

        No.  82 at ¶ 21.)

45.     A different entity of Magna – Gulfstream Park Racing Association, Inc. – owns the

        land at Gulfstream. Pursuant to a "Ground Lease" dated August 3, 2007, Gulfstream

        Park Racing Association, Inc., as landlord, entered into a 99-year ground lease with the

        joint venture (The Village at Gulfstream Park, LLC) as tenant. (Testimony of Brian

        Ratner, Trial Tr., at p. 18; Def. Ex. V; Stipulations, ECF No. 82 at ¶ 22.)

46.     A second agreement, "Option Agreement," also dated August 3, 2007, grants options

        to the joint venture to lease up to approximately 30 additional acres under the same

        terms as set forth in the Ground Lease.  (Testimony of Brian Ratner, Trial Tr., at p.

        100; Def. Ex. W; Stipulations, ECF No. 82 at ¶ 23.)  Under different scenarios set forth

        in the Option Agreement, the options can either be triggered or lapse. (Testimony of

        Brian Ratner, Trial Tr., at pp. 100-102; Def. Ex. W; Def. Ex. LL; Stipulations, ECF

        No. 82 at ¶ 23.)

47.     There are additional ancillary services agreements typically used in development

        projects such as Gulfstream that Magna and Forest City entities executed, such as a

        leasing services agreement, and a management and leasing agreement. Pursuant to

        these agreements, Forest City receives fees that are used to cover the salaries and

overhead for Forest City employees working on the development. The fees received are not a profit center or benefit to Forest City and do not cover all of the salaries and overhead Forest City incurs. (Testimony of Brian Ratner, Trial Tr., at pp. 192-93.)

48.     Forest City has no other development projects ongoing, planned or contemplated with Magna. (Stipulations, ECF No. 82 at ¶ 24.)

### Economic Realities of the Gulfstream Project

49.     Gulfstream originally was contemplated to be a mixed use development project on up to approximately 60 plus acres, and in November 2006, was zoned to allow for approximately 750,000 square feet of retail space, 140,000 square feet of office space, 1500 residential units, a 2500 seat cinema and a 500-room hotel.  (Testimony of Brian Ratner, Trial Tr., at p. 198; Stipulations, ECF No. 82 at ¶ 25.) Magna and Forest City hoped that Gulfstream would manifest into a world class tenant mix with signature marquis tenants, including anchor tenants such as Nordstrom's. (Stipulations, ECF No. 82 at ¶ 25.)

50.     For a variety of reasons and intervening events, most predominantly, the devastating downturn of the economy and its impact on commercial real estate development, the actual development of Gulfstream did not materialize in the way originally contemplated.  The project and the project costs changed dramatically in scope.  First, the project size and scope was reduced dramatically.  At the same time, unfortunately, the project costs increased dramatically.  Forest City's joint venture partner Magna also filed for bankruptcy.  (Testimony of Brian Ratner, Trial Tr., at p. 189.)

51.   Out of the approximately 60 acres available for potential development, the actual
development for the first phase was limited to approximately 30 acres. An additional
11 acres was recently optioned for development to accommodate two new
free-standing retail tenants, Pottery Barn and West Elm. (Testimony of Brian Ratner,
Trial Tr., at p. 114; Def. Ex. BB; Stipulations, ECF No. 82 at ¶ 26.)

52.   In light of all that has gone on with the project, whether the joint venture will ever
exercise options to develop any additional acreage at Gulfstream is highly speculative
at this time. (Testimony of Brian Ratner, Trial Tr., at p. 190.)

53.   With respect to the actual development of the project on the reduced land footprint,
that too changed dramatically.  Instead of 750,000 square feet of retail space, only
approximately 325,000 square feet of retail space has been developed. There are no
anchor tenants. (Testimony of Brian Ratner, Trial Tr., at p. 197; Stipulations, ECF No.
82 at ¶ 28.)  Instead of 140,000 square feet of office space, only approximately 67,000
square feet of office space has been developed. Only 4500 square feet of the office
space has been leased.  (Stipulations, ECF No. 82 at ¶ 28.)

54.   Plans for a large cinema were dropped. Plans for 1500 residential units were dropped.
Plans for 500 hotel rooms were dropped. (Testimony of Brian Ratner, Trial Tr., at p.
201.)

55.   Given the economics of the project, as well as the economic downturn in south Florida,
whether Forest City will ever actually develop additional retail or office space, or a
large cinema, or 1500 residential units, or a hotel at Gulfstream remains speculative.
(*Id*., at pp. 201-202.)

-15-

56.    Over the years, there have been many delays to the project's opening due to things such as changes in project scope, gaming initiatives, zoning delays and most problematically, the inability to attract retail tenants because of the downturn in the economy. In the intervening years while the project was being delayed, some retail tenants who signed leases backed out or went out of business. The opening was delayed several times and over several years.  (Stipulations, ECF No. 82 at ¶ 29.) Nevertheless, after years of delay, Gulfstream finally opened on February 11, 2010, but with only approximately 40% of the retail tenant space actually open for business. In the coming months, Gulfstream should have approximately 85% of the retail space open for business. (Testimony of Brian Ratner, Trial Tr., at p. 207; Stipulations, ECF No. 82 at ¶ 29.)

57.    Forest City's equity investment in Gulfstream and its anticipated return on its investment has changed dramatically as well from October 2003 when it first entered into a Letter of Intent with Magna to develop Gulfstream. (Testimony of Brian Ratner, Trial Tr.)  At that time, and as memorialized in the Development Agreement executed in August 2007 between Forest City and Magna, Forest City was required to fund the first $15 million dollars of the project, and after that, to the extent the project cost exceeded the construction loan and the initial equity funding, Magna and Forest City would provide additional equity and fund the excess amounts on a 50/50 basis. (Testimony of Brian Ratner, Trial Tr., at pp. 128-29, 213; Def. Ex. U; Stipulations, ECF No. 82 at ¶ 30.)

-16-

58.    KeyBank National Association ("KeyBank") provided the construction loan in the amount of up to $127,400,000, which loan closed on August 28, 2007.  Under the terms of the construction loan, Magna and Forest City were required to fund as their equity contribution not less than $71,355,000, and of that amount, Forest City was required to initially fund $14,824,000.  The remaining initial equity funding would come from bond proceeds ($49.6 million), cash from Magna ($2.271 million), and cost reimbursement by the developer of the potential hotel podium's air rights ($4.66 million). (Testimony of Brian Ratner, Trial Tr., at pp. 194-95; Def. Ex. Y; Stipulations, ECF No. 82 at ¶ 31.)

59.    While Forest City initially contemplated a $15 million equity investment, in fact as of October 2009, Forest City's equity investment in Gulfstream was approximately $47.3 million. (Testimony of Brian Ratner, Trial Tr., at pp. 111, 208, 214; Def. Ex. DD).  The unexpected need to place almost $50 million of equity into Gulfstream has dramatically impacted Forest City's anticipated return on its investment and the value created by its investment.  (*Id.*)  In addition, KeyBank has recently advised Forest City that it may require Forest City and Magna to put additional equity into the project. (Testimony of Brian Ratner, Trial Tr., at p. 214; Def. Ex. CC.)

60.    The amount of economic return Forest City reasonably expected from its participation and development of the Gulfstream project has shifted downwards. In August 2007, at the point when the "deal documents" (e.g., Development Agreement, Ground Lease, Option Agreement, construction loan) were executed, the amount of economic return Forest City reasonably expected from its participation and development of the

-17-

Gulfstream project was approximately $5.4 Million. (Testimony of C. Brauser, Def. Ex. II.)  Mr. Brauser is an accountant and financial analysis that Defendant called to testify.  (Def.'s Opening Statement, Trail Testimony, at p. 24.)

61. As of October 2009, in light of what has actually occurred with the Gulfstream project, the amount of economic return Forest City can reasonably expect from its participation and development of the Gulfstream project is zero. (Testimony of C. Brauser, Def. Ex. II).

## II.  CONCLUSIONS OF LAW

1. Plaintiffs have shown, and Defendant agrees, that they are entitled to damages for unjust enrichment.  To prevail on a theory of unjust enrichment under Florida law, a plaintiff must prove all the following elements:

   (1)    The plaintiff has conferred a benefit on the defendant;

   (2)    The defendant has knowledge of the benefit;

   (3)    The defendant has accepted or retained the benefit conferred; and

   (4)    The circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value.  *Media Services. Group v. Bay Cities Communications., Inc*., 237 F.3d 1326, 1330-31 (11th Cir. 2001) (citing Florida state cases).  Defendant represented to the court multiple times that it agreed that Plaintiffs deserved some compensation for unjust enrichment. (*E.g.* Def.'s Opening Statement, Trial Testimony, at p. 27 ("Forest City has always said that plaintiffs are entitled to a fair sum for their efforts.")

-18-

2.  Plaintiffs argue that an expectation of compensation may be relevant to the question of whether it would be unjust to retain a benefit without having to pay for it. Plaintiffs rely on *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469 (7th Cir. 2009) and *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802 (11th Cir. 1999) for this proposition. In *Lindquist*, 557 F.3d at 477, the court decided that the plaintiff was entitled to the reasonable value of his services, and in *Tooltrend*, the plaintiff was not entitled to any recovery under unjust enrichment. The *Tooltrend* court determined that although "expectation might very well be relevant to the question of whether it would be unjust to retain a benefit without having to pay for it," "requiring proof of such an expectation in every case would unduly restrict the expressed concept in Florida law which provides a mechanism for imposing liability in all types of cases where 'the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiffs.'" *Tooltend*, 198 F.2d at 806. Therefore, both decisions recognize that while an expectation of compensation is relevant to the question of whether a benefit has been unjustly retained by a defendant, a mere expectation of compensation alone does not—and cannot—entitle a plaintiff to unjust enrichment damages, much less damages based on unsupported and hypothetical future benefits, as Plaintiffs are urging in this case.

3.  Moreover, courts have made clear that damages under unjust enrichment are not a substitute for breach of contract damages. In *Harris Corp. v. Giesting & Assocs.*, 297 F.3d 1270 (11th Cir. 2002), for example, after affirming the district court's holding that an alleged oral agreement between the plaintiff and the defendant was barred by the

Statute of Frauds, the Court of Appeals addressed whether the plaintiff was entitled to damages under the unjust enrichment theory. The plaintiff argued that "it should recover benefit of the bargain damages in the exact amount that it would have had the contract been enforced." *Id.* at 1276. The Court of Appeals, however, disagreed. It held that the plaintiff "was entitled only to reasonable value of labor performed and the market value of any furnished materials," and that plaintiff in any event "presented insufficient evidence as to these values." *Id.*

4.     Likewise, in *Consumer Incentive Services v. Memberworks Inc.*, 2003 Conn. Super. LEXIS 3381 (Conn. Super. Dec. 8, 2003), the court recognized that the proper measure of damages under the unjust enrichment theory is the "true benefit" conferred on defendant. It held that plaintiff in that case was entitled only to a "finder's fee," not a share of compensation based on revenue from sales that the plaintiff sought from defendant pursuant to an alleged contract between the parties that the court held was not enforceable.  *Id*. at *24.

5.     In practice, courts have applied the measure of damages in unjust enrichment cases to mean the value of services provided by the plaintiff to the defendant, assuming that those services actually benefitted the defendant. See *Media Services Group v. Bay Cities Communications, Inc.*, 237 F.3d 1326, 1330-31 (11th Cir. 2001) (calculating damages in an unjust enrichment case by measuring the value of plaintiff's services to defendant); *Zaleznik v. Gulf Coast Roofing Co.*, 576 So. 2d 776, 779 (Fla. Ct. Dist. App. 1991) ("Under the theory of unjust enrichment, we are effectively recognizing an implied contract which permits the [plaintiffs] to recover the fair value of their

goods and services as a damages remedy."); *see also Tooltrend*, 198 F.3d at 806 ("Notwithstanding that claims for quantum meruit and unjust enrichment arise under distinct causes of action, they may at times share elements of proof such as an expectation of compensation."); *Pleines v. Franklin Construction Co*., 30 Conn. App. 612, 618 (1993) (recognizing that damages in an unjust enrichment case properly can be measured by the reasonable value of services provided); *Shulse v. City of Mayville*, 271 N.W. 643, 647 (Wis. 1937) ("The measure of damages under unjust enrichment is limited to the value of the benefit conferred on the defendant; any costs the plaintiff may have incurred are generally irrelevant. The value of the benefit may be calculated based on the prevailing price of plaintiff's services as long as those services benefited the defendant."; *Int'l Cargo Management Specialists v. EG&G Dynatrend, Inc*., 1995 U.S. Dist. LEXIS 9577, at *51-*52 (D.D.C. Mar. 31, 1995) (holding that "the amount of defendant's unjust enrichment is equal to the fair market value of plaintiffs' services").

6.      In *Media Services Group*, for example, which involved a plaintiff broker's claim for unjust enrichment under Florida law, the Court of Appeals recognized that the appropriate measure of damages was the value of the services provided by plaintiff that facilitated the sale of a radio station owned by the defendant, not the potential future profits from the sale of the radio station. *See Media Services Group*, 237 F.3d at 1330-31.

7.      While Plaintiffs may have brought to Forest City an opportunity, it is Forest City and not Plaintiffs who invested the money and took all the risk. The amount of economic

return Forest City reasonably expected from its participation and development of the Gulfstream project has shifted downwards. Mr. Brauser testified that in August 2007, the amount of economic return Forest City reasonably expected from its participation and development of the Gulfstream project was approximately $5.4 Million, (Brauser Trial Testimony, Def. Ex. II).  Mr. Ratner and Mr. Brauser testified that as of October 2009, the amount of economic return Forest City can reasonably expect from its participation and development of the Gulfstream project is zero. (Testimony of Brian Ratner; Brauser Trial Testimony, Def. Ex. II).  But, in light of the fact that there is no joint venture, it has not been established in any event that if the project were profitable, Plaintiffs would be entitled to a share.

### A.  SERVICES PLAINTIFFS PROVIDED TO DEFENDANT

8.    A similar measure of damages applies in this case.  Plaintiffs should only be awarded the value of their services.  The services in this case were that:

    a.    Froom and Lipman devised the concept of developing the land around Gulfstream Park into a mixed-used commercial development.

    b.    Froom and Lipman brought the concept to Forest City, together with a proposal to obtain Magna's participation in the Gulfstream project. (Testimony of Brian Ratner, Trial Tr., at p. 63 ("Do you agree that they brought the Gulfstream project to Forest City? A. Yes.")

    c.    Plaintiffs offered comments and suggestions on how to develop The Village at Gulfstream Park.  (Testimony of Brian Ratner, Trial Tr., at p. 63 ("I mean, I know Ron over the years suggested things, so I certainly don't think that -- you

know, I would phrase it more that Ron and Mark did bring to us the opportunity, and maybe made some suggestions as to what could be done there."); *Id.*, at p. 64 ("Q. Now, you mentioned that Ron Froom and Mark Lipman made suggestions to you about the development.  A. Yes."); *Id.* ("12 Q. They made a lot of suggestions.  A. Yes, they did."); Testimony of Christian Johannsen, Trial Tr., at p. 410 ("Q. Now, you are aware that plaintiffs offered comments and suggestions on how to develop The Village at Gulfstream Park?  A. Yes, sir, I am.").)

9.  Furthermore, Brian Ratner, Executive Vice President of Forest City Enterprises and president of East Coast Development in the commercial group, stated that Mr. Froom and Mr. Lipman contributed services to Forest City.  (Testimony of Brian Ratner, Trial Tr., at p. 52 ("Q. And Mark and Ron contributed services to Forest City.  A. Yes, they did.").)

10.  Therefore, Plaintiffs, in addition to receiving and amount equivalent to a finder's fee, should be compensated for their comments and suggestions to Defendant about how to develop The Village.  In other words, the court considers the role of Plaintiffs to have been a broker, but the relationship was not a simple or basic one.  Equity is not served by compensating the Plaintiffs as if they were a typical broker on a land transaction earning an average or below-average commission.

11.  Florida courts, as well as courts in other jurisdictions, have made clear that damages in an unjust enrichment case must be determined realistically, not speculatively. See *Belfor United States Group, Inc. v. Bray & Gillespie, LLC*, 2007 U.S. Dist. LEXIS

-23-

94469, at *6-*7 (M.D. Fla. Dec. 27, 2007) (recognizing that recovery under unjust enrichment cannot be based on mere speculation); *Southeast Florida Laborers District Health and Welfare Trust Fund v. Morris*, 1998 U.S. Dist. LEXIS 5440, at *16 (S.D. Fla. Apr. 13, 1998) ("[N]o unjust enrichment claim where plaintiff's claim is purely speculative."); 66 Am. Jur. 2d Restitution and Implied Contracts § 9 (citing *McGrath v. Hilding*, 41 N.Y.2d 625 (1977)) ("Whether there is unjust enrichment may not be determined from a limited inquiry confined to an isolated transaction; it must be a realistic determination based on a broad view of the human setting involved.") (emphasis added); *see also Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 483 (7th Cir. 2009) (damages under the unjust enrichment theory cannot be based on "conjecture").

12.   Therefore, Plaintiffs are entitled to recover damages for unjust enrichment for their roles as brokers, although the brokerage relationship was not explicitly agreed to. Plaintiffs are not entitled to recover as a joint-venture partner. Damages are nowhere near the $8 million range, as Plaintiffs argued. Damages are in the hundreds of thousands of dollars range, as discussed below.

13.   On point is the decision in *Consumer Incentive Services*, which involved a relationship established between the plaintiff and the defendant "to foster new business opportunities." *Consumer Incentive Services v. Memberworks Inc.*, 2003 Conn. Super. LEXIS 3381, at *22 (Conn. Super. Dec. 8, 2003). The plaintiff in that case alleged that the defendant had breached various agreements under which the defendant agreed to

-24-

compensate the plaintiff for business opportunities that the plaintiff introduced to the defendant.

14.   After determining that there was no enforceable contract between the parties, the court in *Consumer Incentive Services* then turned to the theory of unjust enrichment.  After reviewing the facts, the court concluded that the defendant had benefitted through the work and efforts of the plaintiff, which should have been compensated for those efforts. The court observed that the relationship between the plaintiff and the defendant "was established to foster new business opportunities which would be of mutual benefit to all parties hereto." *Id.* at *22 (internal citations omitted). It noted that the plaintiff introduced the defendant to the third party, acted as an intermediary during negotiations, secured information concerning the third party which was provided to the defendant, and attended meetings around the country between the defendant and the third party. The court concluded that "[u]nder these circumstances the court finds that the defendant's failure to compensate the plaintiff for introducing and fostering this valuable business opportunity was unjust and wrong." *Id.* at *22-*23. Accordingly, the key issue before the court was the proper measure of damages.

15.   The plaintiff in *Consumer Incentive Services* argued that the proper measure of the benefit that the defendant derived from the acquisition of the third party corporation in this case was a percentage of the revenue derived from the third party's sales. The court, however, disagreed. First, the court found that "the plaintiff's calculations do not take into consideration the 18.4 million dollars that [the defendant] paid to acquire [the third party]." *Id.* at *23. Second, the court found that "the corporate structure and

-25-

dynamics between the defendant and [the third party] dramatically changed after the acquisition, as did the accounting procedures . . . ." *Id*. Accordingly, the court did not find the various methods employed by the plaintiff to determine commissions to be an accurate reflection of the defendant's "benefit."

16. The court in *Consumer Incentive Services* ultimately determined that the "true benefit" to the defendant was the plaintiff's "discovery" of the third party which led to the acquisition. *Id.* at *24. The court thus concluded that the proper measure of damages as to defendant's unjust enrichment was a "finder's fee," not a share of compensation of revenue from sales as a result of the transaction. *Id*. at *24-*25. Relying on a formula used in the industry to establish fees for bringing companies together, the court held that the plaintiff was entitled to $284,000 in connection with the defendant's $18.4 million acquisition of the third party corporation. *Id*. at *25.

17. It follows that, in this case, the benefit conferred by Plaintiffs is not the value of the Gulfstream Project, but is instead the value of Plaintiffs' services.

18. What Plaintiffs are entitled to is fair compensation for the benefit they conferred on Forest City – i.e., the value of their services on behalf of Forest City. Plaintiffs' role in locating the land and arranging the four meetings between Magna and Forest City was that of a broker. Plaintiff introduced Magna and Forest City, facilitated the relationship between Magna and Forest City that ultimately led to a development deal and ground lease for the approximately 30 acres at Gulfstream, and additional options for approximately another 30 acres, and advised Plaintiffs by offering suggestions of how to develop the land.

## B.  CALCULATING PLAINTIFFS' FEES

19.     Mr. Christopher Johannsen, a commercial real estate broker with 38 years of experience in the South Florida market, testified on behalf of Forest City that the customary, reasonable and usual brokerage fee or commission in the South Florida commercial real market is approximately 2%-3% of whatever value is being used, whether it be land value, cash flow, initial equity invested. (Johannsen Trial Testimony.)

20.     Mr. Johannsen testified that there are four customary and industry recognized methods by which a real estate broker is compensated in a real estate transaction: (1) a negotiated percentage; (2) a present value calculation; (3) a percentage of capital contribution made by the joint-venture partner represented, in this case Forest City; or (4) a flat fee. (Johannsen Trial Testimony.)  Mr. Johannsen then presented alternative ways to apply a 2%-3% commission.

21.     The court finds that the most appropriate method of calculation is the third method, or a percent of the contemplated equity contribution of Forest City.  Applying the third method, a commission is paid based on the initial capital contribution contemplated to be invested by Forest City, not Magna, at the time of the closing of the deal documents. (Johannsen Trial Testimony.) Here, as set forth above, Forest City's initial equity contribution at closing was contemplated to be $15,000,000. Using a commission rate of 3% based on the industry practice and custom, as Defendant suggested the court do in its Amended Proposed Findings of Fact and Conclusions of Law (ECF No. 88), leads to a potential commission due the Plaintiffs of $450,000.

-27-

22.    The court acknowledges Mr. Johannsen's testimony that a different method, the Flat Fee method, is often preferred by real estate developers and brokers because it establishes a known amount independent of the transactional value.  Flat fees are: (a) negotiated; (b) mitigate future risk of non collection to the broker if additional phases are not developed; (c) provide for a "sooner rather than later" (time value of money) receipt of commissions by the broker; and (d) provide for a known, quantifiable amount that can be "line item" budgeted by developers.  However, there is no formula to calculate a flat fee as the amount paid is negotiated between the payor and recipient.  For this reason, the court finds that the Flat Fee method cannot be applied in this case.

23.    Therefore, Mr. Johannsen's calculation using the percentage of capital contribution method amounts to $450,000 owed to Plaintiffs.  The court finds, however, that the damages should be somewhat more than what Defendant's expert, Mr. Johannsen, suggested.  Defendant's expert did not take into consideration the nature and extent of the services Plaintiffs rendered for Defendant but instead spoke on brokerage fees in general.  Defendant's expert did not apply his calculation to the specific facts of this case in that he did not consider the exact benefits Plaintiffs provided Defendant.  As previously discussed, Plaintiffs introduced Magna and Forest City, facilitated the relationship, and advised Plaintiffs by offering suggestions of how to develop the land, as detailed by the factual findings.  They provided more than minimum services that would be provided by a broker.  Therefore, the calculation of $450,000, which is based on the initial capital contribution of $15 million, is probably on the low side.  The court

finds that the amount necessary to fully compensate Froom and Lipman for their services is $750,000.

24.    Because the benefit was conferred by Froom and Lipman prior to the involvement of Froom-Lipman Group, L.L.C., the court finds that Froom-Lipman Group, L.L.C. did not confer any benefit on Forest City.  Judgment therefore should be rendered in favor of Plaintiffs Ronald J. Froom and Mark R. Lipman only.

### III.  CONCLUSION

The court hereby finds that Plaintiffs Froom and Lipman shall receive $750,000 as compensation for their services rendered.

IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

September 27, 2010